UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ERIC BUFORD, as Husband, Next and Special Representative of the Estate of SHERRIE WALKER BUFORD, Deceased, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | 08 C 214 |
| CITY OF CHICAGO, ILLINOIS, a municipal corporation, Chicago Police Officers T. WHITEHEAD, Star No. 17003, D. HUBBARD, Star No. 11291, and SGT. J. SANCHEZ, Star No. 2220, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

CHARLES P. KOCORAS, District Judge:

Defendants City of Chicago and Chicago Police Officers Tracy Whitehead, Dawn Hubbard, and John Sanchez ("Defendants") have filed a motion for summary judgment as well as a motion to strike portions of Plaintiff's Local Rule 56.1(b) Response to Defendants' Statement of Uncontested Facts. For the reasons stated below, we grant summary judgment on Counts I-IV and decline to exercise jurisdiction over the remaining counts. The motion to strike is denied as moot.

## BACKGROUND

During the early hours of January 19, 2007, Officers Tracy Whitehead ("Whitehead") and Dawn Hubbard ("Hubbard") were working for the Chicago Police

Department ("CPD") as tactical officers. Whitehead had been with CPD for fifteen years and made over 500 arrests while Officer Hubbard had five years experience with CPD and made over 100 arrests. On the night in question, Whitehead and Hubbard were patrolling a high-crime area around 115th Street between Wentworth Avenue and LaSalle Street. The officers were patrolling that area because Whitehead had been told by an informant that narcotic sales were being conducted in the vicinity.

At around midnight on January 19, 2007, Hubbard and Whitehead noticed Sherrie Buford ("Buford") walking alone down the driveway of a known narcotics house near the intersection of 115th Street and Wentworth Avenue. The officers approached Buford and spoke with her. Buford told the officers she lived around the corner and that she was returning from visiting a friend. When the officers asked Buford whom she had visited, she did not provide a name. The officers concluded the interview and told Buford to return home to get out of the cold, and she responded that she was already on her way there.[1]

About an hour after their first encounter, Hubbard and Whitehead saw Buford again walking from another known narcotics house in the vicinity of 115th Street and LaSalle Street. The officers decided to speak with Buford again. As they approached

---

[1] Whitehead did not include any description of this encounter with Buford in his arrest report because, in his opinion, it was unrelated to the probable cause for her subsequent arrest.

Buford, Whitehead saw her drop a small item from her right hand. Whitehead was approximately ten to fifteen feet away from Buford when he made this observation. Without losing sight of the item, Whitehead recovered a clear, knotted plastic bag, containing a white, hard, rock-like substance that he suspected to be cocaine. Officer Hubbard did not see Buford drop the plastic bag but nevertheless placed her under arrest for possession of a controlled substance based on Whitehead's belief that she had dropped a bag containing crack cocaine. The officers placed Buford in their squad car and transported her to a police station for processing.

Upon arriving at the station at approximately 1:15 a.m., Whitehead and Hubbard took Buford to the processing room to obtain the information they needed to process Buford's arrest. During this time, Hubbard searched Buford and removed her shoelaces and a belt from her coat. After completing her search, Hubbard escorted Buford to the female holding cell, placed her in the cell, and returned to the processing room to assist Whitehead in processing the arrest. Hubbard placed Buford in the holding cell at about 1:30 a.m.. Sometime thereafter Buford asked Hubbard if she could have her coat because she was cold. Officer Hubbard gave Buford her coat to wear in the cell.

Hubbard and Whitehead each looked in on Buford during her stay in the female holding cell. When Hubbard looked in on Buford she was seated on a bench; Hubbard did not notice anything unusual about Buford at the time. Whitehead also looked into

the cell when he went to get a signature from his supervisor, Sergeant John Sanchez ("Sanchez"). Sanchez's office was located directly across from the female holding cell ; when Whitehead went to see Sanchez at around 2:15 a.m., he also checked on Buford's condition. Whitehead saw Buford in the cell, alive, at that time. Sanchez also looked in on Buford at least once; she was alive and sitting on a bench in her cell.

After obtaining Sanchez's signature, Whitehead walked up front to get the desk sergeant's signature on an inventory form. At around 2:35 a.m., Whitehead obtained the desk sergeant's signature and told Hubbard to remove Buford from her cell. When Hubbard reached Buford's cell, she could not open the door. She called to Whitehead and Sanchez for assistance. Once the officers managed to get the door open, they discovered that Buford had strung a piece of string around the metal grate on the window of the cell door, wrapped the other end around her neck, and sat down on the floor. Buford was unconscious, not breathing, and leaning against the door in a sitting position with her feet splayed out in front of her. Whitehead and Sanchez cut Buford down, and Sanchez began performing CPR on Buford while Whitehead ran to the front desk to request an ambulance. Whitehead also called for Officer Sharon Poole ("Poole") another officer whom he knew to be a nurse. After requesting an ambulance, Whitehead returned to the cell with Poole. Poole relieved Sanchez and performed chest compressions on Buford until the paramedics arrived. While Buford was still at the

station, Poole checked her vital signs and concluded that she had died. Paramedics arrived on the scene at 2:52 a.m. and transported Buford to Roseland Hospital at 3:05 a.m. Buford was pronounced dead twenty-five minutes later.

Plaintiff Eric Buford ("Plaintiff"), Buford's husband and representative of her estate, filed suit against Defendants on January 7, 2008. Plaintiff asserted several § 1983 claims against Officers Hubbard, Whitehead, and Sanchez, alleging that the officers violated his wife's Fourth Amendment rights by falsely arresting her and by failing to act in an objectively reasonable manner in taking steps to prevent her suicide. Plaintiff further alleges that the individual officers engaged in a conspiracy to violate his wife's constitutional rights. Plaintiff also asserts a § 1983 claim against the City of Chicago as well as various claims under Illinois law.

Defendants now move for summary judgment.

## LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when the evidence is such that a reasonable jury could find for the nonmovant. *Buscaglia v. United States*, 25 F.3d 530, 534 (7th Cir. 1994). A party seeking summary

judgment bears the burden of demonstrating the absence of a genuine issue of material fact by specific citation to the record; if the party succeeds in doing so, the burden shifts to the nonmovant to set forth specific facts showing that there is a genuine issue of fact for trial. Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In considering motions for summary judgment, a court construes all facts and draws all inferences from the record in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

With these principles in mind, we turn to Defendants' motion.

## DISCUSSION

### I. Fourth Amendment Claims

Plaintiff asserts that Defendants violated Buford's Fourth Amendment rights in two respects. Plaintiff first argues that Defendants were unreasonably inattentive to the risk that Buford would commit suicide during her detention at the police station. Plaintiff also contends that Defendants subjected Buford to an unreasonable seizure by arresting her without probable cause.

#### A. Unreasonable Inattention to Suicide Risk

Plaintiff first argues that Defendants subjected Buford to an unreasonable seizure in violation of her Fourth Amendment rights by failing to take certain steps to prevent her suicide. In *Lopez v. City of Chicago*, 464 F.3d 711, 719 (7th Cir. 2006), the Seventh

Circuit held that "the Fourth Amendment governs the period of confinement between arrest without a warrant and the preliminary hearing at which a determination of probable cause is made[.]" Claims regarding conditions of confinement for arrestees like Buford, who had yet to receive a judicial determination of probable cause at the time of her death, are therefore governed by the Fourth Amendment's "objectively unreasonable" standard. *Williams v. City of Chicago*, 509 F.3d 392, 403 (7th Cir. 2007).

Though the Seventh Circuit has yet to address what standards govern Fourth Amendment claims in the suicide context, a review of analogous precedent supports a conclusion that officers must receive some form of notice of suicide risk before their failure to prevent an arrestee's suicide can be considered objectively unreasonable. The Seventh Circuit has required arrestees claiming their Fourth Amendment rights were violated when officers were unreasonably indifferent to their medical needs to show that the officers in question had notice of the condition. *Id.* (citing *Sides v. City of Champaign*, 496 F.3d 820, 828 (7th Cir. 2007)). The notice requirement manifests an understanding that police officers are not guarantors of an arrestee's health and safety but must first receive some notice of an arrestee's potential health risks before they can be said to have acted unreasonably if the risks are realized. In this instance, to assess whether the officers acted in an objectively unreasonable manner we must determine

whether Buford provided any notice, either through her words or her conduct, that she posed a danger to herself.

Plaintiff has presented no evidence that Defendants received any notice that Buford was a danger to herself. Buford did not say anything to the arresting officers or anyone at the police station to indicate that she contemplated suicide. Nor did anything in her behavior suggest that she presented a suicide risk. Whitehead, Hubbard, and Sanchez all testified that Buford remained calm throughout her arrest and brief detention. Without any indication of notice to Defendants, we cannot say that the Defendants acted in an objectively unreasonable manner. We therefore hold that Defendants are entitled to summary judgment on Plaintiff's first Fourth Amendment claim.

B. False Arrest

Plaintiff also argues that Hubbard and Whitehead violated her Fourth Amendment rights by subjecting her to false arrest. In order to prevail on a § 1983 claim for false arrest, Plaintiff must show that the police had no probable cause to arrest Buford for possession of a controlled substance. *Kelley v. Myler*, 149 F.3d 641, 646 (7th Cir. 1998). The existence of probable cause "is an absolute defense to any claim under section 1983 against police officers for wrongful arrest." *Mustafa v. City of Chicago*,

442 F.3d 544, 547 (7th Cir. 2006). Therefore "summary judgment is proper if the record establishes that at the moment the arrest was made, the facts and circumstances within the officers' knowledge were sufficient to warrant a prudent person believing" Buford committed the offense of possession of a controlled substance. *Montano v. City of Chicago*, 535 F.3d 558, 568 (7th Cir. 2008) (quoting *Beck v. Ohio*, 379 U.S. 89 (1964)) (internal quotation marks and other editorial marks omitted).

The undisputed facts demonstrate that immediately prior to her arrest, Whitehead and Hubbard observed Buford leaving a house where drug sales were known to occur. This encounter occurred late at night within an area with a high crime rate. When the officers approached Buford, Whitehead saw her drop a plastic bag containing what he believed was cocaine. These facts were sufficient for a prudent person to believe that Buford had committed the offense of possession of a controlled substance. *See* 720 ILCS 570/402. Plaintiff nevertheless argues that genuine issues of fact exist as to the presence of probable cause because Hubbard did not see Buford drop the item in question. Plaintiff's position notwithstanding, this portion of Hubbard's story does not conflict with Whitehead's account of the events leading up to Buford's arrest. Hubbard does not dispute that Whitehead observed Buford drop the item; in the absence of such a dispute there is no material issue of fact to resolve at trial on this issue. Because we find that the facts and circumstances known to Whitehead and Hubbard prior to placing

Buford under arrest were sufficient to support a finding of probable cause, we grant Defendants' summary judgment as to Plaintiff's false arrest claim.

## II.    § 1983 Conspiracy Claim

Plaintiff further contends that Whitehead, Hubbard, and Sanchez conspired to deprive Buford of her Fourth Amendment rights. A constitutional deprivation is a necessary predicate to a § 1983 conspiracy action. *Goldschmidt v. Patchett*, 686 F.2d 582, 585 (7th Cir. 1982). Because Plaintiff has not shown a violation of Buford's civil rights, we grant Defendants judgment as a matter of law on Plaintiff's § 1983 conspiracy claim.

## III.   *Monell* Claim Against City of Chicago

Plaintiff's *Monell* claim also fails for similar reasons. Though a municipality may be held liable for a constitutional deprivation under *Monell v. Dep't of Social Servs.*, 437 U.S. 658 (1978), a plaintiff must show that constitutional rights were violated in order to succeed on his *Monell* claim. *See Reynolds v. Jamison*, 488 F.3d 756, 764 n.4 (7th Cir. 2007). Plaintiff has not established that Buford sustained a violation of her constitutional rights, and therefore we must grant summary judgment on Plaintiff's *Monell* claim.

## IV.    Plaintiff's Remaining State Law Claims

The remaining claims of Plaintiff's complaint are state law actions for false arrest and wrongful death against Defendants as well as a claim under the Illinois Survival

Act, 755 ILCS 5/27-6. Because we have granted summary judgment on Plaintiff's federal claims, there are no claims remaining over which we have original jurisdiction. We decline to exercise our supplemental jurisdiction over the state law claims, and they are accordingly dismissed. 28 U.S.C. § 1367(c)(3). This dismissal is without prejudice to their refiling in state court if Plaintiff so chooses. *See* 28 U.S.C. § 1367(d); *Jinks v. Richland County*, 538 U.S. 456, 462-63 (2003) (noting that state limitations period is tolled during pendency of federal suit if supplemental state claims are dismissed after dismissal of federal claims).

## CONCLUSION

Based on the foregoing analysis, Defendants' motion for summary judgment is granted as to Counts I-IV. Counts V-VII are dismissed pursuant to 28 U.S.C. § 1367(c). Because we did not rely on any of the challenged portions of Plaintiff's Response to Defendants' Statement of Facts in ruling on the motion for summary judgment, the motion to strike is denied as moot.

Charles P. Kocoras
United States District Judge

Dated: \_\_\_\_\_December 3, 2009\_\_\_\_\_